PIONEER CREDIT CORPORATION *vs.* COMMISSIONER OF BANKS & another.

Suffolk.    March 3, 1965. — May 5, 1965.

Present: WILKINS, C.J., SPALDING, KIRK, SPIEGEL, & REARDON, JJ.

*Retail Instalment Sales of Motor Vehicles. Constitutional Law,* Equal protection of laws, Sales finance company. *Motor Vehicle,* Retail instalment sale. *Equity Pleading and Practice,* Declaratory proceeding.

Where the buyer under a motor vehicle retail instalment contract covered by G. L. c. 255B prepays in full the remaining debt under the contract on a day during an instalment period, "the sum of the periodic time balances after the day on which prepayment is made," specified in § 16, includes the periodic time balance at the end of the instalment period in which the prepayment is made.   [219–221]

The plaintiff in a suit in equity against State officials for a declaratory decree under G. L. c. 231A was not precluded by want of notice to the Attorney General under § 8 from raising a question of constitutionality

---

where the Attorney General appeared as counsel for the defendants. [221]

A company which engaged in the business of a "sales finance company" under G. L. c. 255B and was also a small loans licensee under c. 140, §§ 96–113, was not unconstitutionally discriminated against or denied equal protection of the laws in that it was subjected to the licensing requirements, regulations, and investigatory powers under c. 255B whereas banks as defined in c. 167, § 1, and national banking associations were exempt therefrom.    [221, 223–224]

BILL IN EQUITY filed in the Superior Court on October 25, 1963.

The suit was reported by *Forte, J.*

*James C. Gahan, Jr.,* for the plaintiff.

*Nelson I. Crowther, Jr.,* Assistant Attorney General, for the defendants.

SPIEGEL, J.    This is a bill in equity for a declaratory decree to determine the rights, duties and status of the plaintiff under G. L. c. 255B, § 16, which governs the payment of refunds of finance charges under motor vehicle retail instalment contracts paid in full before maturity.    The judge, without decision,[1] reported the suit on the "statement of facts and material issues" contained in his report.    The pleadings material to the report are incorporated therein.

The plaintiff is a "sales finance company" as defined by G. L. c. 255B, § 1, engaging, "in whole or in part, in the business of purchasing retail instalment contracts from one or more retail sellers," and is licensed pursuant to G. L. c. 255B, § 2.    It is also a small loans licensee regulated under G. L. c. 140, §§ 96–113, as amended.    The defendant Hynes is the Commissioner of Banks (commissioner) under G. L. c. 26, § 2, as amended through St. 1963, c. 801, § 63. The defendant Hanley is the deputy commissioner of banks

---

[1] The judge ordered the entry of an interlocutory decree as follows: "1.    That the . . . [plaintiff] is to segregate the amount of money by which the amount of all refunds of finance charges on motor vehicle contracts which the . . . [defendant] alleges would be required by the provisions of G. L. . . . [c] 255B, exceeds the amount of such refunds actually made by the . . . [plaintiff] from December 15, 1961, and to hold said amount of money so segregated for the accounts of those buyers of motor vehicles to whom such refunds shall be due if the . . . [defendants'] contention is upheld, until a final decree on the merits has been entered.    2.    That the . . . [plaintiff] shall preserve all its books, records and transactions since December 15, 1961, insofar as they may reflect such alleged overcharges."

and supervisor of loan agencies under G. L. c. 26, § 4, as amended by St. 1941, c. 596, § 21.

A "retail instalment contract" which would be purchased by the plaintiff is "an agreement, entered into in this state, pursuant to which the title to, the property in or a lien upon a motor vehicle, which is the subject matter of a retail instalment sale, is retained or taken by a retail seller from a retail buyer as security, in whole or in part, for the buyer's obligation." G. L. c. 255B, § 1. A "retail instalment sale" is "a sale of a motor vehicle by a retail seller to a retail buyer for a time sale price payable in two or more instalments, payment of which is secured by a retail instalment contract. The cash sale price of the motor vehicle, the amount, if any, included for insurance and other benefits, recording charges and finance charge shall together constitute the time sale price." G. L. c. 255B, § 1. Under G. L. c. 255B, § 9, the retail instalment contract must contain, inter alia, the following items: "(1) the cash sale price of the motor vehicle which is the subject matter of the retail instalment sale; (2) the amount of the buyer's down payment, itemizing the amounts paid in money and in goods and containing a brief description of the goods, if any, traded in; (3) the difference between items (1) and (2); (4) the amount, if any, included for insurance on the motor vehicle . . .; (5) the amount, if any, included for other insurance and other benefits . . .; (6) the amount of recording charges; (7) the principal balance, which is the sum of items (3), (4) and (5); (8) the amount of the finance charge; (9) the time balance, which is the sum of items seven and eight, payable in instalments by the buyer to the seller . . .." A retail seller would assign such a contract to the plaintiff, which would expect to profit from the collection of the finance charge.

Section 14 provides the maximum rates of finance charges. For example, the maximum rate for "any new motor vehicle designated by the manufacturer by a year model not earlier than the year in which the sale is made" is "not more than eight dollars per one hundred dollars per year."

"Such finance charge shall be computed on the principal balance as determined under section nine on contracts payable in successive monthly instalments substantially equal in amount." The majority of the contracts purchased by the plaintiff are customarily payable in such equal monthly instalments. Section 16, upon which the controversy at bar turns, provides as follows: "Notwithstanding the provisions of any retail instalment contract to the contrary, any buyer may pay in full at any time before maturity the debt of any retail instalment contract, and in so paying such debt shall receive a refund credit thereon for such anticipation. The amount of such refund credit shall represent at least as great a proportion of the finance charge after first deducting from such finance charge an acquisition cost of twelve dollars and fifty cents as the sum of the periodic time balances after the day on which prepayment is made bears to the sum of all the periodic time balances under the schedule of instalments in the original contract. Where the amount of the credit for anticipation of payment is less than one dollar, no refund need be made." Thus, for purposes of illustration, we hypothesize an instalment contract whereby a "time balance" (see § 9 [9], *supra*), consisting of a principal balance of $2,200 and a finance charge of $200, is payable in equal instalments at the end of each month over a twelve month period. The "time balance" before the end of the first month is therefore $2,400 and is equal to the entire debt under the contract, and the amount to be paid each month is $200. During the fifth month under such a schedule the "periodic time balance" would be $1,600 since $800 in the form of four $200 instalments would have already been paid. If, at the end of the fourth month, the buyer were to pay the fourth instalment of $200 *plus* the whole of the remaining debt under the contract ($1,600), he would be entitled under § 16 to a refund of part of the finance charge. As part of the process of determining the amount of this refund, the section requires that an "acquisition cost" of $12.50 be first deducted from the $200 finance charge in our hypothetical

example.  The remaining $187.50 would then be multiplied by a fraction equivalent to "the sum of the periodic time balances after the day on which prepayment is made" ($7,200) over "the sum of all the periodic time balances under the schedule of instalments in the original contract" ($15,600).  The amount of the refund would thus be $86.54.[2] There is no dispute between the parties as to the factual situation illustrated above.  The dispute arises, as will be shown *infra,* when a prepayment is made *during* a month or period and not at the *end* of the month or period.

On December 15, 1961, Hanley sent a memorandum to "All Licensees," stating, with regard to § 16: "The words, 'after the day' in effect mean that only full months can be charged against the buyer.  EXAMPLE 1.  A contract is prepaid in full fifteen (15) days after said contract commenced. The customer would receive a rebate of the entire finance charge less the acquisition cost of twelve dollars and fifty cents.  EXAMPLE 2.  A twelve month contract is made on February 1 and is paid in full on June 29.  The buyer would receive a rebate of eight (8) months even though the contract has run four (4) months and twenty nine (29) days.  This is due to the fact that credit for any partial month must be given to the buyer.  All licensees must follow the above procedure for prepayment commencing immediately."

The plaintiff asserts that this memorandum has no legal effect because Hanley had no power to issue it.  However, whether we treat the memorandum as a validly promulgated regulation and whether Hanley or the commissioner had the power to issue it are immaterial questions in the

---

[2] The same result is obtained by the so called Rule of 78 or the "sum of the digits" method.  Since retail instalment contracts are usually based on twelve month periods, the months of the year are designated by the digits 1 through 12, the sum of which gives 78.  This figure is used as the denominator of the fraction to determine the refund of the finance charge.  The sum of the digits representing the months anticipated is the numerator.  Since the digits represent the months remaining in the debt period, the first month thereof is designated by 12, the second by 11, and so forth.  This method of computation is expressly prescribed by G. L. c. 255, § 12B, as amended through St. 1959, c. 593, which concerns consumer goods other than motor vehicles covered by G. L. c. 255B.  See Hogan, A Survey of State Retail Instalment Sales Legislation, 44 Cornell L. Q. 38, 57–58.

case at bar, for, as it is apparent *infra,* there is, in our view, only one permissible construction of § 16. The defendants in their brief agree with and defend the position taken in the memorandum, and we thus regard the memorandum as part of their contention as to the proper construction of § 16. We do not here decide whether Hanley is a proper party in this case. We do note that under § 21, "[w]hoever violates any provision of . . . [chapter 255B] . . . shall be punished by a fine of not more than five hundred dollars or by imprisonment for not more than six months, or both." Furthermore, under § 7 a "license may be suspended or revoked by the commissioner . . . [for] failure to comply with the provisions of" c. 255B. Inasmuch as the plaintiff would act at its peril under § 16 in the face of these sections and in view of the commissioner's interpretation of § 16, there is before us a controversy under G. L. c. 231A.

It is the plaintiff's contention that the "numerator of the refund fraction [under § 16] is derived . . . [from] the periodic time balance which . . . [becomes due at the start of] the next full period after the day of prepayment." It argues that, under the defendants' interpretation of § 16, "if the buyer prepays in full during a month or installment period, not only does he receive a refund of that portion of the finance charge fairly allocable to periods anticipated, but he would also receive a refund credit for finance charges fairly allocable to a portion of the contract [period] which the buyer himself permitted to run. The seller or his assignee is thereby deprived of that portion of the finance charge which is applicable to a partially elapsed installment period — in other words, the buyer is given the use of the seller's (or his assignee's) capital for this period . . ., but thus escapes the obligation to pay him for it. Since the buyer is in sole control of the selection of the day on which prepayment is made, it hardly seems equitable . . . to give him also the power to employ another's capital without compensation."

The issue is simply whether, under § 16, "the sum of the periodic time balances after the day on which prepayment

is made'' includes the periodic time balance at the end of the month or period in which prepayment is made. We are of opinion that it is so included.

When the statute in question was enacted (1958 Senate Bill No. 238, p. 10; 1958 Senate Journal, p. 1539; 1958 House Journal, p. 2050), a number of bills on the subject had been considered by the committee on banks and banking. See 1958 Senate Journal, p. 465. One of them, 1958 Senate Bill No. 240, p. 15, provided, with respect to the finance charge refund, as follows: ''The amount of such refund credit shall . . . be computed by the '78th's' method and shall represent a credit for the number of months prepaid from the month after the contract month during which prepayment is made to the month the final instalment is due.'' That such a provision was proposed but not enacted· supports an inference that the Legislature rejected the approach contained therein. If, instead of employing the present language of § 16, the Legislature had said ''[t]he sum of the periodic time balances *after the month* in which prepayment is made,'' there would appear to be an intention that the periodic time balance at the end of the month in which prepayment is made were not to be included. The Legislature took this approach in G. L. c. 255, § 12B, as amended through St. 1959, c. 593, which applies to sales on credit of consumer goods other than motor vehicles within the meaning of c. 255B. That section provides: ''as the sum of the periodical time balances *after the month* in which the debt is paid in full'' (emphasis added). Having chosen, in G. L. c. 255B, § 16, to employ the phrase ''after the day,'' we infer that the Legislature intended what the language of that section seems to say.

We note the additional provision contained in § 16 that an ''acquisition cost'' of $12.50 be deducted from the finance charge before the refund of a portion of that charge is calculated. This statutory deduction in favor of the sales finance company could well equalize the conflicting considerations involved in determining the amount of the refund of the finance charge where payment of the entire debt is tendered in advance between two instalment dates. Under

§ 16 the buyer does not pay a finance charge for the whole instalment period in which he makes prepayment of the entire debt, and the sales finance company is compensated by payment of the "acquisition cost" of $12.50. In this connection, it is obvious that in some contracts this amount could exceed the finance charge rates for a comparable period which are ordinarily allowable under § 14. The extent to which the finance charge refund is decreased by the "acquisition cost" deduction is a factor to offset the greater relative costs to the sales finance company on prepaid instalment contracts. We mention these considerations to show that our interpretation of § 16 does not necessarily result in a deprivation of compensation to the sales finance company for that portion of an instalment period prior to the day of prepayment. We hold that, under § 16, "[t]he sum of the periodic time balances after the day on which prepayment is made" includes the periodic time balance at the end of the month or period in which prepayment is made.

The plaintiff also contends that the regulations, fees and examinations to which it is subject under G. L. c. 255B are unconstitutionally discriminatory inasmuch as banks (as defined in G. L. c. 167, § 1) and national banking associations need not be licensed under G. L. c. 255B, § 2, and thus need not pay license fees or be subject to certain regulatory or investigatory powers of the commissioner under certain sections of G. L. c. 255B. Engaging also in the small loans business, the plaintiff is subject to license and fee requirements and various regulations under G. L. c. 140, §§ 96 through 113, as amended. It appears to argue that the additional requirements imposed under G. L. c. 255B, in view of the exemption therein of banks, are unconstitutionally burdensome.[3]

---

[3] The defendants assert that the plaintiff is barred under G. L. c. 231A, § 8, from raising any constitutional questions since the record is devoid of evidence indicating that notice to the Attorney General was sent pursuant to that section to the effect that "a question of constitutionality is involved." However, the Attorney General appears as counsel for the defendants, and we think that the purpose of § 8 has thus been served. See *Weinstein* v. *Chief of Police of Fall River*, 344 Mass. 314, 315, n. 1.

The purpose of the licensing requirement of G. L. c. 255B, § 2, is stated within the section itself: "The commissioner may reject any application for a license or any application for the renewal of a license if he is not satisfied that the financial responsibility, character, reputation, integrity and general fitness of the applicant and of the owners, partners or members thereof, if the applicant be a partnership or association, and of the officers and directors, if the applicant be a corporation, are such as to command the confidence of the public and to warrant the belief that the business for which the application for a license is filed will be operated lawfully, honestly and fairly." Banks exempted from the licensing requirement of this section are extensively regulated under G. L. c. 167. See also G. L. cc. 167A (bank holding companies); 168 (savings banks); 170 (coöperative banks). National banking associations, also exempted from the licensing requirement of this section, are fully regulated under 12 U. S. C. §§ 21–215b (1959), as amended (Supp. V, 1964). These State and Federal statutes establish detailed and stringent standards for banks and banking operations and provide for extensive governmental supervision thereof. There is no such broad regulation and supervision of small loans businesses under G. L. c. 140, §§ 96–113, as amended. The purpose of this latter statute is only "to prohibit the unlicensed business of making small loans and to prevent an excessive rate of interest on such loans. The statute was passed as a protection to the borrower; it was intended to make the statute effective and to prevent its evasion by indorsing notes given for such loans to third parties."[4] *Cuneo* v. *Bornstein,* 269 Mass. 232, 236. *Modern Fin. Co.* v. *Holz,* 307 Mass. 281, 285. Under G. L. c. 140, § 114A, as amended through St. 1963, c. 646, "[T]rust companies, savings banks, co-operative banks, savings and loan associations, credit unions, national banking associations and federal savings and loan

---

[4] "Any loan made or note purchased or endorsement or guarantee furnished by an unlicensed person in violation of . . . [§§ 96–111] shall be void." G. L. c. 140, § 110, as amended through St. 1962, c. 795, § 2.

associations'' need not be licensed as small loans businesses under G. L. c. 140, § 96, as amended. The statutory pattern thus shows that banks and national banking associations are regulated more extensively than small loans businesses and are regarded for purposes of G. L. c. 140, §§ 96–113, as amended, as being sufficiently qualified to operate as small loans businesses without also being required to be licensed as such. Therefore, with regard to G. L. c. 255B, the Legislature has a rational basis for distinguishing between banks and small loans licensees as to their presumptive fitness to operate as motor vehicle sales finance companies. The Legislature could determine that banks and national banking associations need not be licensed under G. L. c. 255B, § 2, because they already ''command the confidence of the public'' and are likely to operate ''lawfully, honestly and fairly'' as motor vehicle sales finance companies. Cf. *Mutual Loan Co.* v. *Martell,* 200 Mass. 482, 486–487, affd. 222 U. S. 225; *Dewey* v. *Richardson,* 206 Mass. 430, 433; *Rockland-Atlas Natl. Bank* v. *Murphy,* 329 Mass. 755, 757. The case at bar is therefore unlike *Hall-Omar Baking Co.* v. *Commissioner of Labor & Indus.* 344 Mass. 695, where we said that there was nothing in the nature of the itinerant sale of baking goods to support the statutory requirement of a license to do business therein in a sound and inoffensive way while at the same time the statute exempted similar business in dairy products from all such license requirements. We held the statute unconstitutional in its application to a baking company ''in view of the exemption in respect of milk companies and the sale of dairy products.'' *Id.* at 709. We conclude that the licensing requirement of G. L. c. 255B, § 2, as applied to the plaintiff, does not constitute ''invidious discrimination,'' and is not ''essentially arbitrary.'' *Morey* v. *Doud,* 354 U. S. 457, 463, 464. See *Central R.R. Co.* v. *Pennsylvania,* 370 U. S. 607, 617–618. The statutory distinction between banks and others is ''based on differences that are reasonably related to the purposes of the Act in which it is found.'' *Morey* v. *Doud, supra,* 465. For the principles

applicable whenever the constitutionality of a statute is attacked, see *Hall-Omar Baking Co.* v. *Commissioner of Labor & Indus.* 344 Mass. 695, 700–701; *Coffee-Rich, Inc.* v. *Commissioner of Pub. Health,* 348 Mass. 414, 422–423. The plaintiff has not sustained its burden of showing that the statute in question violates the State or Federal Constitutions. The plaintiff's summary assertion that the license fee imposed under G. L. c. 255B, § 2, constitutes a discriminatory "excise tax" is not supported by fact or argument, and we find it without merit.

Accordingly, a final decree is to be entered stating that, under G. L. c. 255B, § 16, "the sum of the periodic time balances after the day on which prepayment is made" includes the periodic time balance at the end of the month or period in which prepayment is made, and that the licensing requirements of G. L. c. 255B, § 2, as applied to the plaintiff, are constitutional.

*So ordered.*